EMMA A. BIDDLECOM, Respondent, v. GENERAL ACCIDENT ASSURANCE COMPANY, Appellant.

Kansas City Court of Appeals, November 11, 1912.

1. INSURANCE ACCIDENT: Misrepresentation: Jury. Plaintiff seeks to recover $200.00 on a policy of accident insurance for $1000.00. Plaintiff had settled with the defendant for $800.00, and signed a release fully discharging the defendant from all further liability. Plaintiff now contends that she was induced by the defendant to sign the release by false and fraudulent representations namely, that the policy was void because her husband had changed his occupation. *Held*, plaintiff could recover the $200.00 and interest, as the question of misrepresentation was properly submitted to the jury.

2. ————: Fixed Sum: Consideration. Where the amount of the benefit in a policy of insurance is for a fixed sum, a settlement and receipt for a less sum is without consideration.

3. ————: Consideration: Liquidated Amount. Where an unqualified tender of part of a liquidated amount is accepted it will not prevent an action for the balance as the acceptance was without consideration.

4. ————: Compromise Agreements: Doubtful Rights. Compromise agreements are upheld when the parties fairly suppose that their rights are doubtful.

5. ————: False Representations: Ignorance of His Rights. The maxim of the law that "fraud vitiates all contracts" applies where a settlement is procured by false representations, if the party relying upon such representations, agrees to the proposed compromise in ignorance of his rights.

6. TENDER: Misrepresentation: Settlement. Party need not tender back the sum received when suing on a fraudulent contract, because such a sum being received under the misrepresentation, is not a sufficient consideration to support the settlement, since the beneficiary gained nothing thereby, nor did the insurer lose anything.

Appeal from Jackson Circuit Court.—*Hon. Robt. E. Middlebrook*, Judge.

AFFIRMED.

*Rosenberger & Reed* for appellant.

*W. B. Dickinson* for respondent.

BROADDUS, P. J.—The plaintiff seeks to recover $200 on a policy of accident insurance for $1000, it being alleged in her petition that $800 had been paid to her by defendant. It is alleged that the policy was issued to her husband; and that he was killed by an electric shock May 9th, 1909.

The answer admits the issuance of the policy, death of the insured and demand by plaintiff of $1000, the amount of the insurance; and further avers that after said death, defendant, believing that it was not liable to plaintiff, refused payment of her demand, so that a dispute arose between plaintiff and defendant as to its liability on said policy; and that on July 17th, 1909, the parties compromised their dispute by defendant paying plaintiff $800 and by plaintiff executing a release fully discharging the defendant from all further liability. The release is copied into defendant's answer.

Plaintiff's reply admits that she signed the release and surrendered the policy, but alleges that she was induced to sign the same by false and fraudulent representations.

At the time deceased was insured he was in the employ of the Monarch Vinegar Works as a stationary engineer. At the time of his death he was in the employ of the Nelson Grain Company in the same capacity.

In the building where the deceased was killed there were three heavy insulated electric wires on the main circuit that came into the building, and which were brought down parallel to each other along the wall near the motor. These wires were not continuous. They were cut and a space of six or eight inches was removed. In these spaces were pieces of copper or

brass about a quarter of an inch thick and one inch wide; one end fastened on a hinge joint so that each one could be placed directly in line with the wire and touch each end that had been severed, and in that way make a continuous circuit. The construction formed a switch. In order to disconnect the circuit, the pieces were pulled backward. For this purpose the company had a pole, a nonconductor, six or eight feet long with a hook at the end with which a person standing the distance of the pole could pull the pieces backward without danger of being shocked. It was shown that the hands of deceased came in contact with these pieces of brass, which were not insulated at the time. It appeared, however, that he had had the pole, but it did not appear whether he had it at the time or not.

It is provided in paragraph 10 of the policy that: "If the insured is injured after having changed his occupation or duties to one classified by this corporation as more hazardous than that herein stated, or is injured while doing any act or thing pertaining to any more hazardous occupation, the corporation's liability shall be only for such proportion of the principal sum or other indemnity as the premium paid by him will purchase at the rate fixed by this corporation for such more hazardous occupation." And there was a further provision that the policy did not cover injuries resulting wholly or in part from unnecessary exposure to obvious risk of injury or obvious danger.

The plaintiff, in part, testified as follows: "I am the widow of John P. Biddlecom. He was killed at the Park elevator, where I saw him about ten minutes afterward lying on a platform of a motor of the engine room. His body was about a foot away from the wires and switches used in connection with the motor. Part of the flesh of his hands was on these wires and switches. I had seen him about an hour before and he was not intoxicated.

"After my husband's death I notified the company over the telephone and they told me to come up there just as soon as I could; and I think, as nearly as I can remember, it was about—it was after my husband was buried; that was a week later; I went up to the Insurance Company's office on Grand avenue and I seen Mr. Long and he told me that he had nothing whatever to do with the insurance, and sent me to Mr. Reed's office, and I went to Mr. Reed's office in the New York Life Building, and I told him I wanted a settlement for the insurance and he gave me some blanks and told me when they were properly filled I should return them; and so I left his office and after they were properly filled I brought them back and he told me just as soon as he heard from the home company he would let me hear from him. And I called up over the phone several times, and it seemed a long time afterward, because I believe the home company was away from here—in Scotland. And I think I called him up and he told me that he had heard from the home company, and I went up to his office, and when I went up to his office he told me that the company did not owe me anything. And so finally he agreed that the company owed me $666 and some cents, and I got mad and I told him I would not take that and I left his office, and I did not know what to do. I never had had any business experience, and it was my first. I left his office and I thought about Mr. Hocker of the Massachusetts Life Insurance Company. My husband had a policy in that company, and I thought he could help me and I did not know what else to do. So I asked him and he told me I had better have a lawyer. He asked me if I had a lawyer and I told him I had not; that I did not trust any lawyers. And he advised me to get a lawyer and he told me about Mr. Dickinson, and I believe he called Mr. Dickinson up in his office. I ain't sure, but I believe he did. And he introduced Mr. Dickinson to me, and I did not, at that time, talk to Mr. Dickinson about

this insurance; but I afterward went up to Mr. Reed's office, and I seen him again about this insurance and he told me that $750 was all the company owed me. And after that I went to Mr. Dickinson's office and I told Mr. Dickinson about it, and I told him that I wanted him to collect that money for me, and I asked him to collect that money and told him I would pay him for his trouble. And I believe Mr. Dickinson went down to Mr. Reed's office and talked to him, and I forget what he had to say about the insurance, but I believe he said that was all the company owed me. So I told Mr. Dickinson I would pay him for his trouble later on, because I was afraid—I thought they were all trying to beat me. And as soon as I came home I thought about Mr. Nelson of the Nelson Grain Company and I went to his office. That is, I called him up over the 'phone and asked him if he would do anything for me, and Mr. Nelson told me he would see Mr. Reed, and I called him up several times and he told me he had not heard from Mr. Reed, but he would go and see him; and finally I called him up and told him that Mr. Reed said $800. After I heard from Mr. Nelson I went to Mr. Reed's office and—no, in fact, I called up Mr. Reed and he told me that there was a check up there for $800—the company's check—and I went up to Mr. Reed's office. He told me if I wanted to accept that check that it was all the company owed me and I didn't know whether— he showed me a book. It was some kind of an insurance book he showed me. He said that was all the company owed me under some conditions; I don't know what conditions. He showed them. And I thought that was all I would ever get and so he gave me a paper to sign and I remember of signing that paper, but I don't know what I signed, and he gave me a check or draft for $800. I took the draft to the bank and left it there and had it cashed.

"Mr. Reed told me that my husband had changed his occupation and I told him that he had not changed

it; that he was still a steam engineer. I believed what he said because he showed me in a book that there was no more coming to me than that amount. I had discharged my attorney, Mr. Dickinson, before the settlement was made. I have been paid only the $800. The company did not ask me to make fuller or further proofs of death or do anything else to sustain my claim.

"Cross-examination. My first visit to Mr. Reed's office was two weeks after my husband's death, I belive, but am not sure. I saw him there three or four times, but called there a number of times when he was not in. On my first visit Mr. Reed told me the company was not liable to me. He also offered to pay six hundred and some odd dollars in compromise. Before my second visit to Mr. Reed I had consulted Mr. Hocker, an insurance man, and on his advice, I employed Mr. Dickinson, a lawyer. I laid the facts before Mr. Dickinson before I again saw Mr. Reed. I left the policy with him for collection. Mr. Dickinson saw Mr. Reed and reported that he had offered to pay $750. He also told me that $750 was all that the company owed me, and at one time he said that the company did not owe me anything. At my first visit with Mr. Reed he told me that the company owed me nothing because my husband had changed his occupation. I signed Exhibit No. 1, as follows:"

The release in question was headed "Compromise Release," which recited, among other things, that the defendant "has denied and still denies all liability to me under said policy of accident insurance. And, whereas, said parties are desirous of settling and compromising said controversy." Then follows a recitation of the terms of the compromise and the receipt of the $800.

The court refused to instruct the jury that their verdict should be in favor of the defendant. And refused to instruct that the plaintiff, having failed to re-

turn the $800 received from the defendant, could not maintain the action. And also refused to instruct that if defendant, by its attorney at the time and all times prior to the settlement, denied its liability to plaintiff under the policy, then the verdict should be for defendant. And also further that the plaintiff having signed the release, she is conclusively presumed to have known its contents.

. The jury were instructed that there was no evidence in the case that any fraudulent representations were made to plaintiff, or that she was induced to sign the release by fraudulent representations. And that if "there was a genuine dispute between plaintiff and defendant touching defendant's liability under the policy, and that there was reasonable doubt as to defendant being liable for $1000, and that said dispute was compromised by the payment by defendant of $800 to plaintiff, then your verdict must be for the defendant, even though you may further believe from the evidence that the defendant was wrong or mistaken in the position it took."

And another instruction asked by the defendant, to the purport that if at all times during the negotiations, defendant's attorney, in good faith, denied all liability for any sum under the policy, the verdict should be for defendant, was refused. The court modified the said instruction as follows: "The court instructs the jury that if you believe from the evidence that the defendant, through its attorney, at all times in its negotiations with the plaintiff or her representatives, in good faith acting under the reasonable belief that it owed plaintiff nothing, denied its liability to plaintiff for any sum under the policy of insurance referred to in evidence and in good faith without deceiving her, compromised with her for $800 paid to her by it, then your verdict must be in favor of defendant."

Instruction No. 1 given for plaintiff, in effect, authorized the jury to return a verdict in her favor if

they found that defendant, by its agent, represented that it was not liable on said policy, and that she had no claim against defendant, and that her husband had changed his occupation, and that under a clause of the policy she could in no event recover more than $800; provided, they believed that said statements were false and that the denial of liability was not made in good faith by defendant; and that plaintiff was at said time in great distress of mind on account of the death of her husband, and that she was without business experience and ignorant of her rights; and that she believed and relied on said statements, and so believing she had no claim for more than $800, did receive the said $800 and surrender the said policy without any other or further consideration.

The jury returned a verdict for plaintiff for $200 and interest. From the judgment defendant appealed.

The defendant's brief and argument cover a wide field, and there is not much fault to be found in its position as to the law relating to compromises of disputed rights, and the effect to be given to written agreements.

It must be conceded that it is well settled law that a party is bound by the language of his written contract, and that it is not competent for him to undertake to destroy its effect by trying to contradict its terms by oral testimony.

And, it may also be conceded that the compromise of a disputed claim is supported by a sufficient consideration. But the question is raised by the respondent that there was no such consideration here, as the plaintiff's claim was for a liquidated demand. It is held that where the amount of the benefit in a policy was for a fixed sum, a settlement and receipt for a less sum was without consideration. Goodson v. National M. A. Association, 91 Mo. App. l. c. 351. "Where an unqualified tender of part of a liquidated amount is accepted, it will not prevent an action for the balance, as the

acceptance was without consideration.'' St. Joseph School Board v. Hull, 72 Mo. App. 403. The payment of a less sum is no consideration for the discharge of a larger liquidated amount.' Crowder v. Continental Casualty Co., 115 Mo. App. 1. c. 539. Those authorities are applicable if the transaction is to be treated as a mere receipt of plaintiff's claim.

But we will first consider the dispute raised as to whether plaintiff was entitled to anything under the policy, as defendant claimed that deceased had unnecessarily exposed himself to obvious danger, in which case the policy was void, and also that he had changed his occupation to one more hazardous, in which case the liability of the company was limited by the amount of premium paid.

As we view the case, the only real question at issue was whether the dispute as to those matters was made in good faith. ''Compromises are favored in law. They tend to diminish litigation and promote the repose of society. Compromise agreements are upheld where the parties fairly suppose that their rights are doubtful.'' King v. Ins. Co., 36 Mo. App. 1. c. 140. A compromise stands upon the same footing as other contracts; it must be fairly entered into and conducted by the parties who have a dispute as to their rights. If there be an actual dispute and the compromise is effected by a fair process of dealing, it is binding upon the parties. But if the dispute is not raised by one of the parties in good faith, and the settlement is procured by his false artifices and false representations, and the other, relying upon such representations, agrees to the proposed compromise in ignorance of his rights, the agreement is void. In this respect, the maxim of the law, that ''fraud vitiates all contracts,'' applies.

The only question before us is, as has been said, was the compromise the result of an honest dispute between the parties, or was it the result of a dispute

raised for the purpose of defrauding plaintiff of the full benefit of the policy of insurance; and, in our view, the evidence was properly directed to the issue.

The manner in which deceased came to his death was not shown to have been occasioned by his exposure to obvious danger unnecessarily. It is true, he was killed by putting his hands on the uninsulated wires. But this proof fell far short of showing that he intentionally came in contact with these wires, and, in the absence of which the presumption is that the act was not done voluntarily, unless his intention was to commit suicide, but that it was accidental. That he had not changed his occupation to one more dangerous was sufficiently shown.

Plaintiff's evidence went to show that all liability of the defendant for any sum whatever was predicated upon the ground that deceased had changed his occupation, which was no excuse at all for denial of all liability. Afterwards, the defendant receded from its position in that respect, and acknowledged that it was liable under the limited liability clause and offered to settle for about $666, a sum much less than its actual liability under said clause. Finally, the settlement was effected by paying plaintiff $800, fifty dollars in excess of such liability if said clause was applicable. We think the evidence thus far indicates that defendant's purpose was first to avoid all liability under the policy, but, finding that the plaintiff was persistent in her demand and had consulted with a lawyer, it changed its tactics and insisted that she settle her claim under the limited liability clause, for which there was no good excuse whatever. Being a woman of little business knowledge and not knowing her rights, she accepted the proposed settlement, having previously discharged her lawyer, and entered into the written contract denominated a ''Compromise Release,'' relying upon the representations of defendant's agent. We think there was a sufficient evidence to submit this issue to the jury

whether or not the purported compromise was procured by fraud.

We will not discuss the question raised by defendant, that it was not essential that its contention that it was not liable was in truth legally correct, but it was sufficient if there was a reasonable doubt on the part of defendant of its liability, as that matter was submitted to the jury and their finding is conclusive thereon.

The instructions given by the court were of the most conflicting character. Those for defendant eliminated all question of fraud in the procurement of the compromise, while plaintiff's instruction predicated her right to recover on the ground that it was procured by fraud. But as the error was only prejudicial to the plaintiff, it is not a good ground for complaint upon the part of defendant.

As the plaintiff, in her reply to defendant, failed to tender back the $800 she had received, it is insisted that the reply did not state a cause of action. It is the rule that where a party seeks to avoid a contract on the ground of fraud, it is his duty to tender back to the other party what he has received from him before he can recover, that is, he can not receive the benefit of the transaction that he seeks to set aside. But this is not a case where the rule applies, for the reason that plaintiff is entitled to more than he has received, and the law treats it as a payment. The plaintiff gave credit for it in her petition. It is said, in such cases, the payment of such less sum is not a sufficient consideration to support the settlement, since the beneficiary gained nothing thereby, nor did the insurer lose anything. Goodson v. Accident Association, 91 Mo. App. l. c. 339; St. Joseph School Board v. Hull, 72 Mo. App. 403.

In cases of this kind the party seeking to set aside a release on the ground that it was obtained by misrepresentation is not compelled to tender back the

amount he received at the time the release was obtained before he can claim the difference between the amount then paid and the whole amount due. Winter v. K. C. Cable Co., 73 Mo. App. 173.

All other assignments of error are unimportant, as, in our opinion, the judgment is for the right party, for which reason it should be affirmed, and it is so ordered. All concur.